UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CHRISTIAN L. DAVIS,

        Plaintiff,      :      Case No. 2:17-cv-995

  - vs -                            Judge Sarah D. Morrison
                                    Magistrate Judge Elizabeth Preston Deavers
COMMISSIONER OF SOCIAL
SECURITY,
                                  :
        Defendant.

**OPINION AND ORDER**

Christian Davis ("Plaintiff") brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income ("SSI"). This matter is before the Court on the Plaintiff's Objection (ECF No. 20) to the Report and Recommendation (R&R) issued by the United States Magistrate Judge on January 16, 2020 (ECF No. 19), recommending that the Court overrule Plaintiff's Statement of Errors and affirm the Commissioner's decision. For the reasons set forth below, the Court **SUSTAINS** Plaintiff's Objection, **ADOPTS** in part and **REJECTS** in part the Magistrate Judge's R&R, and **AFFIRMS** in part and **REVERSES** in part the Commissioner's decision. The case is **REMANDED** to the Commissioner under the Fourth Sentence of 42 U.S.C. § 405(g) for proceedings consistent with this Opinion.

I.    BACKGROUND

    A.    **Procedural History**

On August 19, 2011, Plaintiff's mother filed an application for SSI benefits on Plaintiff's

1

behalf. (R. at 69). At that time, Plaintiff was 15 years old. (*Id.* at 57). Plaintiff's claims were denied initially on November 16, 2011, and upon reconsideration on February 29, 2012. (*Id.* at 89–95, 99–106). Following a hearing, administrative law judge ("ALJ") James B. Griffith issued a decision finding that Plaintiff was not disabled on May 16, 2013. (*Id.* at 10–25). Plaintiff turned eighteen on January 27, 2014. (*Id.* at 175). The Appeals Council subsequently denied review and adopted the ALJ's decision as the Commissioner's final decision on August 21, 2014. (*Id.* at 1–5).

Thereafter, Plaintiff filed a civil action in this Court (Case No. 2:14-cv-1909) and the Court remanded the case back to the Appeals Council. (*Id.* at 1567–69). On October 23, 2015, the Appeals Council vacated and remanded ALJ Griffith's decision. (*Id.*). The case was then assigned to ALJ Edmund Giorgione who held a hearing on February 3, 2016. (*Id.* at 1438). However, because ALJ Giorgione passed away before issuing a decision, another hearing was held by ALJ Timothy Gates on August 2, 2016. (*Id.*). On September 1, 2016, ALJ Gates issued a decision finding that Plaintiff was not disabled either prior to or since attaining age 18. (*Id.* at 1438–66). The Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision on September 18, 2017. (*Id*. at 1281–84).

Plaintiff filed this case on November 15, 2017 (ECF No. 3), and the Commissioner filed the administrative record on January 26, 2018 (ECF No. 8). Plaintiff filed a Statement of Specific Errors (ECF No. 11), and the Commissioner responded (ECF No. 17). On January 16, 2020, the Magistrate Judge issued her Report and Recommendation. (ECF No. 19). After a thorough analysis, the Magistrate Judge recommended affirming the Commissioner's non-disability findings. On January 30, 2020, Plaintiff timely filed an Objection to the Magistrate's R&R. (ECF No. 20). The Commissioner filed a brief Response on February 3. (ECF No. 21).

2

**B. Relevant Record Evidence**[1]

**1. Hearing Testimony**

Plaintiff, represented by counsel, appeared and testified at the February 3, 2016 administrative hearing before ALJ Giorgione. At the time of the hearing, Plaintiff was 20 years old. (R. at 1481). Plaintiff testified that migraines and arthritis are the primary ailments that prevent him from being able to work. (*Id.* at 1482). According to Plaintiff, he suffers from migraines constantly and has pain in his back and all of his joints. (*Id.* at 1482–83). He testified that if the pain is bad enough he uses a cane or walker, and the pain tends to get worse depending on the weather. (*Id.* at 1483). Plaintiff testified that he can sit for 35 minutes at a time and stand and walk for 25–30 minutes before he needs to sit. (*Id.*). The most he can lift is 17 pounds. (*Id.*). Plaintiff stated that he has difficulty with stairs, has sensitivity to light and sound, and has difficulty focusing. (*Id.* at 1484). He does not "really like being around folks because of [his] pain." (*Id.*). Plaintiff also complained of problems with his vision. (*Id.* at 1485).

Plaintiff testified that he can dress himself, although it takes time. (*Id.*). He is able to shower or bathe himself, but sometimes he needs help getting out of the shower. (*Id.*). He does not have a driver's license because he is "prone to passing out." (*Id.* at 1485–86). Plaintiff testified that he cannot cook well, and he tends to forget about laundry, but he can wash dishes a few at a time although he does have trouble gripping objects. (*Id.* at 1486, 1492). Plaintiff also testified that he is often nauseous, which has gotten worse since starting infusions at Nationwide Children's Hospital. (*Id.* at 1486).

---

[1] Since Plaintiff does not object to the Magistrate Judge's recommendation as to his first contention of error, the relevant record evidence encompasses only that which comes after Plaintiff attained the age of majority.

3

Plaintiff testified that he graduated high school with mostly C's and D's. (*Id.* at 1487). He "had to miss so much school that [he] had to attend summer school" and was nearly held back. (*Id.*). According to Plaintiff, he "started spiraling in depression" after the death of his grandparents. (*Id.* at 1489). Plaintiff stated that prior to his grandfather's death, he acted as one of his primary caregivers. (*Id.* at 1495). Plaintiff elaborated that this meant he "tried taking care of him for more than a month." (*Id.*). Plaintiff stated that during that time he attempted to change and wash his grandfather, but he would throw his back out trying to pick him up and ended up having to call his mother to help him. (*Id.* at 1495–96). Plaintiff testified that "[t]here are some days where it is physically impossible for [him] to get out of [his] bed." (*Id.* at 1490). This occurs approximately four times a week on average. (*Id.*). Plaintiff testified that because he only sleeps three to four hours a night, he often sleeps an hour during the day. (*Id.* at 1494–95). He spends most of his days lying down. (*Id.* at 1495).

Vocational Expert Lynelle Hall ("VE") also testified. Although Plaintiff had previously worked at a car wash part-time for a month and half, he had to leave the job due to his "ailment." (*Id.* at 1482). As a result of this very brief work history, ALJ Giorgione concluded that there was no past relevant work. (*Id.*). The ALJ proposed a hypothetical to the VE, which limited Plaintiff to lifting and carrying 20 pounds occasionally and ten pounds frequently, constantly bilaterally reaching, frequently bilaterally handling and fingering, standing 45 minutes at time for two hours,[2] walking 30 minutes at a time for two hours, sitting 60 minutes at a time for four hours, and occasionally bending, crouching, crawling, and climbing steps and ladders. (*Id.* at 1497–98). The VE testified that under these conditions, Plaintiff could perform sedentary jobs, including

---

[2] These parameters encompass a typical eight-hour workday.

addresser, table worker, and assembler. (*Id.* at 1498). However, Plaintiff could not sustain employment with an additional two 15-minute breaks per day, outside of the 30-minute lunch and two 15-minute breaks typically allotted. (*Id*. at 1500). Similarly, if Plaintiff required regular breaks requiring a quiet, dark setting where he could lie down, or was regularly tardy, the VE testified that those limitations would be work preclusive. (*Id*. at 1500–01).

When asked to alter the hypothetical to Plaintiff also missing less than five days of work per month, the VE testified that "anything more than one day off per month would be work preclusive, up to four or five times per year." (*Id.* at 1498–99). When asked to alter the original hypothetical to limit Plaintiff to work in relative isolation, the VE testified that the Plaintiff could still do the same three identified sedentary jobs. (*Id.* at 1499). When asked to keep the same hypothetical but Plaintiff would not be able to maintain an eight-hour workday or a 40-hour workweek because of an inability to maintain attention and concentration, the VE testified that no work would be available to Plaintiff. (*Id.*). Similarly, if on a month-to-month basis Plaintiff had one unscheduled absence and one unscheduled tardiness, Plaintiff could not sustain competitive employment. (*Id*. at 1501).

Plaintiff, represented by counsel, appeared and testified at the August 2, 2016 supplemental administrative hearing before ALJ Gates. Plaintiff testified that his conditions worsened since the February hearing. (*Id.* at 1510). He elaborated that as of May or June, he had been getting infusions once a week for pain and inflammation, which are "almost unbearable." (*Id*. at 1510, 1514). Further, it is hard for him to get up during the day and he has migraines and back pain constantly. (*Id.* at 1510). Plaintiff also testified that since the February hearing, the vision in his left eye had gotten significantly worse and he had been diagnosed with ptosis. (*Id.*).

Vocational Expert Lynne Kaufman also testified at the supplemental hearing. The ALJ

5

asked the VE to alter the original hypothetical proposed at the February hearing to include occasional interaction with supervisors and co-workers and no contact with the general public. (*Id.* at 1517–18). The VE testified that "there would be some light jobs you could do as well as some sedentary" including the jobs identified at the February hearing. (*Id.* at 1518–19). When asked to alter the original hypothetical so that Plaintiff would be off task more than 10% of the time, the VE testified that Plaintiff would be unable to sustain competitive work. (*Id.* at 1520). In contrast to VE Hall's testimony, VE Kaufman did not believe that an extra 30 minutes of daily breaks would necessarily be work preclusive. (*Id.*). However, she did acknowledge that most competitive work does not provide a place to lie down during breaks. (*Id.* at 1521).

2. **Hospital Records**

Since 2011, Dr. Charles Spencer at Nationwide Children's Hospital has acted as Plaintiff's treating rheumatologist. (*Id*. at 495). In February 2014, Dr. Spencer saw Plaintiff for back, hip, and knee pain, headaches, and dizziness. (*Id.* at 1998). Dr. Spencer noted that the combination of arthritis and fibromyalgia is difficult and recommended Plaintiff continue Orencia infusions since Plaintiff reported they were helping even though not fully. (*Id.* at 1998–99). In August 2014, Dr. Spencer noted that Plaintiff "knows the Orencia works" although Plaintiff still suffered from bad headaches. (*Id.* at 2007). Dr. Spencer also noted that Plaintiff was "overall better" and that he had graduated from high school. (*Id.* at 2008).

On January 14, 2015, Dr. Spencer saw Plaintiff for a follow-up visit and noted that Plaintiff had been better over the past 18 months "but not good enough." (*Id.* at 2017). He noted that Plaintiff's knees, ankles, and back still hurt and that he had been trying to work part-time at a car wash but was not successful. (*Id.*). Dr. Spencer also noted that Plaintiff's grandfather was ill and that it was having an effect on him. (*Id*.). Dr. Spencer changed Plaintiff's infusion

6

medication to Actemra after assessing that Plaintiff was 50 to 60 percent where he needed to be "but not there." (*Id.* at 2018). Plaintiff had also developed psoriasis due to the infusions. (*Id.*). In April 2015, Dr. Spencer saw Plaintiff and noted that he "overall feels slightly better" and was more mobile, but Plaintiff was still having back and knee pain and his migraines had gotten worse. (*Id.* at 2027). Dr. Spencer noted that Plaintiff's grandfather and uncle passed away in the past month and that "[Plaintiff] was a primary caregiver for grandfather" and "had difficulty finding work since his death." *(Id.)*. Dr. Spencer concluded that Plaintiff's arthritis was better, but that depression was clear given the recent deaths in Plaintiff's family. (*Id.* at 2030). He also stressed that Plaintiff needed to wear his glasses, as this was likely exacerbating his migraines. (*Id.*). Dr. Spencer prescribed a trial of SSRI medication and gave Plaintiff a referral to talk therapy. (*Id.*).

On July 15, 2015, Dr. Geoffrey Heyer submitted a letter noting Plaintiff's diagnoses as "chronic daily headaches, chronic fibromuscular pain, fibromyalgia, and chronic fatigue." (*Id.* at 2058). Dr. Heyer had been treating Plaintiff in his Headache and Pain Clinic at Nationwide Children's Hospital since February 2012. (*Id.*). He opined that Plaintiff's combination of depression and chronic pain "can lead to severe disability." (*Id.*). He also opined that Plaintiff "has a substantial disability burden and very poor quality of life as a consequence." (*Id.*).

In September 2015, Dr. Spencer saw Plaintiff and noted that his arthritis was still bad in his back, fingers, hips, knees, and ankles and that the infusions were helping "but not great." (*Id.* at 2040). Dr. Spencer recommended that Plaintiff continue infusions and start injections for hip, knee, and ankle pain. (*Id.* at 2041). On November 19, 2015, Dr. Spencer noted that Plaintiff's arthritis was slightly better, but Plaintiff's mood was low. (*Id.* at 2052). Dr. Spencer started Plaintiff on Zoloft for mood elevation and recommended Plaintiff continue infusions. (*Id.*).

On January 21, 2016, Dr. Spencer saw Plaintiff and noted that Plaintiff reported he was "doing badly" with a lot of joint pain. (*Id.* at 2110). He noted that the infusions were helping but only for two weeks, and Plaintiff was "staying in bed all day." (*Id.*). Dr. Spencer noted that things were "way out of control" and prescribed Plaintiff IV treatment and referred him to a psychologist. (*Id.* at 2112). The next day, Dr. Spencer submitted a letter noting Plaintiff's diagnosis as "chronic arthritis due to Juvenile Idiopathic Arthritis" and remarked that Plaintiff was also developing spondyloarthritis. (*Id.* at 2057). He opined that Plaintiff "has improved, but he remains partially disabled" for the following reasons:

> 1) He has trouble standing for an extended period of time due to his back and other joint pain.
> 2) He has difficulty walking any distance.
> 3) He cannot bend over well or frequently.
> 4) He has joint pain that may be distracting at times doing tasks while sitting and standing.
> 5) He may miss work days or arrive late at times due to his illness.

(*Id.*).

In March 2016, Dr. Spencer noted that Plaintiff was still having "lots of back pain and leg pains" but the infusions were helping more than anything else had "but still pain can be bad." (*Id.* at 2121). He also noted that Plaintiff's labs were good, but that Plaintiff needed help with Midrin for headaches. (*Id*. at 2122). Dr. Spencer recommended that Plaintiff continue infusions and referred Plaintiff to a pain clinic. (*Id.*). On May 19, 2016, Dr. Spencer saw Plaintiff for a follow-up visit and noted that his pain was worse following a car accident. (*Id.* at 2132). Dr. Spencer noted that Plaintiff had not yet been able to see a pain doctor and recommended weekly IV medication and continuing to get infusions at an increased dosage. (*Id.* at 2132–33). Dr. Spencer also ordered back and pelvis x-rays, which came back normal. (*Id.* at 2133, 2147).

8

### 3. Medical Source Statements

On July 24, 2015, Dr. Spencer completed a medical source statement. Starting with Plaintiff's physical limitations, Dr. Spencer opined that Plaintiff could lift one to five pounds constantly, six to ten pounds frequently, and 11 to 20 pounds rarely. (*Id.* at 1695). He opined that Plaintiff could frequently reach and finger with both arms, frequently handle with his right hand, and occasionally handle with his left hand. (*Id.* at 1695–96). In an eight-hour workday, Dr. Spencer opined that Plaintiff could stand for a total of four hours, 45 minutes at a time, walk for a total of two hours, 45 minutes at a time, and sit for a total of five hours, 60 minutes at a time. (*Id.* at 1696). He also opined that Plaintiff could frequently bend and crawl, occasionally squat and slowly climb steps, but never climb ladders. (*Id.*). Plaintiff could not use foot controls but could reach above shoulder level. (*Id.* at 1696–97). According to Dr. Spencer, due to his severe pain, Plaintiff's condition was likely to deteriorate if placed under stress associated with a job, and he was likely to have unscheduled absences from work five or more days a month. (*Id.* at 1697).

Moving to Plaintiff's mental limitations, Dr. Spencer did not note any social interaction limitations. (*Id.* at 1698). He opined that Plaintiff would generally have mild limitations regarding sustained concentration and persistence due to pain, and moderate limitations regarding his ability to perform at production levels expected by most employers. (*Id.* at 1699). Dr. Spencer opined that Plaintiff would have mild limitations responding appropriately to changes in a work setting and being aware of normal hazards and taking necessary precautions. (*Id.*). He opined that Plaintiff would have moderate limitations remembering locations, workday procedures and instructions, and tolerating customary work pressures. (*Id.* at 1699–70). Dr. Spencer noted that stress and unscheduled absences at work would be likely, which could be

distracting and limiting. (*Id.* at 1700). This assessment was based on Plaintiff's diagnosis of juvenile arthritis. (*Id.* at 1697).

Six months later on January 14, 2016, Dr. Spencer completed a second medical source statement. Dr. Spencer opined that Plaintiff could lift one to ten pounds constantly, 11 to 20 pounds occasionally, and 21 to 50 pounds rarely. (*Id.* at 1883). He opined that Plaintiff could constantly reach with both arms, and frequently handle and finger with both arms/hands (*Id.* at 1883–84). Plaintiff's postural limitations in an eight-hour workday did not change, except he could now only walk for two hours, 30 minutes at a time. (*Id.* at 1884). Dr. Spencer opined that Plaintiff could occasionally bend, crouch, squat, crawl, and climb steps and ladders (*Id.*). Plaintiff could now use foot controls and could still reach above shoulder level. (*Id.*). Dr. Spencer still opined that Plaintiff's condition was likely to deteriorate if placed under stress associated with a job, but he now opined that Plaintiff was likely to have unscheduled absences from work less than five days a month. (*Id.* at 1884–85).

With regards to Plaintiff's updated mental limitations, Dr. Spencer opined that Plaintiff would have mild limitations during general social interactions. (*Id.* at 1886). He still opined that Plaintiff would generally have mild limitations regarding sustained concentration and persistence due to pain, and moderate limitations regarding his ability to perform at production levels expected by most employers. (*Id.* at 1887). But Dr. Spencer now opined that Plaintiff would only have mild limitations responding appropriately to changes in a work setting and tolerating customary work pressures. (*Id.* at 1887–88). The new assessment was based on Plaintiff's diagnosis of juvenile arthritis and fibromyalgia. (*Id.* at 1885).

C.   **The ALJ's Decision**

The Magistrate Judge accurately described the ALJ's decision. (*See* R&R, 17–19, ECF

No. 19). At step four of the sequential process,[3] the ALJ set forth Plaintiff's residual functional capacity ("RFC")[4] as follows:

> Since attaining age 18, [Plaintiff] has had the residual functional capacity to perform sedentary work as defined in 20 CFR 416.967(a), except he can lift and/or carry 20 pounds occasionally and ten pounds frequently, handle and finger frequently, stand 45 minutes at a time and two hours total in workday, walk 30 minutes at a time and two hours total in a workday, sit for 60 minutes at a time and four hours total in a workday, and occasionally bend, crouch, crawl, and climb. From a mental standpoint, he is able to occasionally interact with supervisors and coworkers but must avoid contact with the general public.

(R. at 1460).

In arriving at Plaintiff's RFC, the ALJ found Plaintiff's testimony regarding the intensity, persistence and limiting effects of his symptoms to be not entirely consistent with the objective findings of the record. (*Id.*). The ALJ gave "significant weight" to Dr. Spencer's January 2016 medical source statement and "little weight" to his July 2015 medical source statement. (*Id.* at 1462). However, the ALJ did not give Dr. Spencer's 2016 assessment controlling weight. Noting Plaintiff's long treating relationship with Dr. Spencer, the ALJ explained his reasoning as follows:

> His later assessment, when he had the experience of having treated the claimant for a longer period, is more consistent with the above-summarized evidence that documents persistent reports of musculoskeletal tenderness that would effectively limit the claimant to sedentary work with occasional postural activities and frequent fingering and handling. However, the above-summarized treatment record and reported activities of living are not consistent with the alleged intensity of symptoms and limitations to support Dr. Spencer's opinion that the claimant's condition would likely deteriorate under stress, that he would be distracted from completing tasks, or that he would likely to have excessive absences from work . . . . Accordingly, I cannot give Dr. Spencer's more recent assessment controlling weight.

---

[3] *See* R&R, fn.2, ECF No. 19.
[4] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1).

* * *

> In July 2015, Dr. Spencer indicated only mild or no impairment to mental work-related abilities except for moderately impaired abilities to perform at production levels expected by most employers and to tolerate customary work pressures, which Dr. Spencer suggested was due to physical conditions, not due to mental impairment (Exhibits 29F and 30F). Dr. Spencer concluded that the claimant would have up to five days of absences per month due to mental impairment. In January 2016, Dr. Spencer made a similar assessment, except he indicated only mildly impaired ability to tolerate customary work pressures (Exhibit 35F). As Dr. Spencer is not a mental health professional and the above-summarized record does not document significant, persistent ongoing deficits supporting moderate limitations in the functional areas indicated, or excessive work absences, I give this assessment no significant weight.

Relying on both VE's testimony, the ALJ determined that Plaintiff could perform a number of unskilled sedentary jobs that exist in significant numbers in the national economy. (*Id.* at 1465). He therefore concluded that since attaining age 18, Plaintiff was not disabled under the Social Security Act. (*Id.*).

## II. STANDARD OF REVIEW

If a party objects within the allotted time to a report and recommendation, the Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Civ. P. 72(b). Upon review, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). The Court's review "is limited to determining whether the Commissioner's decision 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 512 (6th Cir. 2010) (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

## III. ANALYSIS

In his Statement of Specific Errors, Plaintiff asserted two assignments of error. With regard to the first assignment of error—the ALJ improperly evaluated the opinion evidence of record in determining that Plaintiff was not disabled under the childhood standard of disability—Plaintiff did not file a timely objection to the Magistrate's R&R recommending that this contention of error be overruled. Accordingly, as to Plaintiff's first assignment of error the Court **ADOPTS** the Magistrate Judge's R&R and **AFFIRMS** the Commissioner's decision.

Plaintiff's second assignment of error also forms the basis of his Objection to the Magistrate Judge's R&R. Specifically, Plaintiff contends that the Magistrate Judge erred in finding that the ALJ provided good reasons for rejecting Plaintiff's treating physician's opinion regarding his adult disability claim. Specifically, Plaintiff argues that the ALJ failed to provide good reasons for discrediting Dr. Spencer's opinion regarding Plaintiff's ability to respond to stress, complete tasks, and minimize absences. Plaintiff contends that the explanation cited by the ALJ and the Magistrate is insufficient to contradict Dr. Spencer's opinion. The Court agrees.

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to 'a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s)' if the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *LaRiccia v. Comm'r of Soc. Sec.*, 549 Fed. Appx. 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)).

13

Closely associated is "the good reasons rule," which requires an ALJ "always give good reasons . . . for the weight given to the claimant's treating source's opinion." *Dixon*, 2016 WL 860695, at *4 (internal quotations omitted); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 550–51 (6th Cir. 2010); 20 C.F.R. § 404.1527(c)(2). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (internal quotations omitted).

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013). Remand may be appropriate when an ALJ fails to provide adequate reasons explaining the weight assigned to the treating physician's opinion, "even though substantial evidence otherwise supports the decision of the Commissioner." *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed Appx. 852, 860 (6th Cir. 2011) (internal quotations omitted); *Bernola v. Comm'r. of Soc. Sec.*, 127 F. Supp. 3d 857, 862 (N.D. Ohio 2015).

In failing to give Dr. Spencer's opinion that Plaintiff would likely deteriorate under stress, be distracted from completing tasks, or be likely to have excessive absences, controlling weight or even significant weight, the ALJ cites: "the above-summarized treatment record and

reported activities of living are not consistent with the alleged intensity of symptoms and limitations" and "the above-summarized record does not document significant, persistent ongoing deficits." (R. at 1462–63). However, these reasons are not sufficient to disregard a treating physician's opinion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 246 (6th Cir. 2007) (holding that the ALJ's statement that "the record does not support the limitations of the severity suggested by Dr. Stein," was insufficient to explain why the treating physician's opinion was not given controlling weight*)*; *Hale v. Comm'r of Soc. Sec.*, 307 F. Supp. 3d 785, 794 (S.D. Ohio 2017) (finding that the ALJ's conclusory statement that the treating physician's opinion was not "well supported by medically acceptable clinical and laboratory diagnostic techniques nor consistent with other substantial evidence in the case record" was too ambiguous). The ALJ must identify the specific evidence in the record that supports a finding that a treating physician's opinion was inconsistent with other substantial evidence in the record and apply the factors listed in 20 C.F.R. § 404.1527(c)(2)—length of the treatment relationship, frequency of the examination, nature and extent of the treatment relationship, supportability of the medical source, consistency of the medical opinion, specialization of the treating physician, and other important factors.[5] *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009). Moreover, the fact that Dr. Spencer is "not a mental health professional," is only one factor to be considered when weighing the opinion of a treating physician. *Jackson v. Comm'r of Soc. Sec.*, 989 F. Supp. 2d 657, 669 (S.D. Ohio Sep. 23, 2013). This alone does not provide a good reason for failing to give Dr. Spencer's opinion controlling weight, particularly where Dr. Spencer's opinion at issue is

---

[5] Effective for claims filed after March 27, 2017, the Social Security Administration's new regulations alter the treating physician rule in a number of ways. *See* 20 C.F.R. §§ 404.1527, 416.927 (2016).

based on Plaintiff's mental *and* physical impairments.

While the Magistrate Judge cites the ALJ's findings that "Plaintiff had graduated from high school and was feeling better, that he was not experiencing distress, that he had been the primary caregiver for his grandfather, and that he was actively seeking work" (R&R, 29), as possible examples of inconsistencies in the record, the Court agrees with Plaintiff that without further explanation, these are not "good reasons" to reject Dr. Spencer's opinion, or even reasons contrary to Dr. Spencer's opinion. Plaintiff testified that while he graduated high school, he missed so much school due to his ailments that he had to attend summer school and was almost held back. (R. at 1487). While Plaintiff sometimes reported feeling better, he also reported to Dr. Spencer in January 2016 that he was "doing badly" and "staying in bed all day" due to the pain he was experiencing. (*Id.* at 2110). Although Plaintiff did testify that he acted as one of his grandfather's primary caregivers, this only lasted for approximately one month and he had to call his mom to come home to help him. (*Id.* at 1495–96). Finally, while Dr. Spencer reported that Plaintiff had been looking for work since his grandfather's death, Plaintiff testified that one of the reasons he had to leave the only (part-time) job he ever held was because he took too much time off due to his pain. (*Id.* at 1491–92). *See Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio Mar. 11, 2013) ("It is generally recognized that an ALJ may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.") (internal quotations omitted)). VE Hall acknowledged that "anything more than one day off per month would be work preclusive, up to four to five times per year." (*Id.* at 1498–99).

In formulating Plaintiff's RFC, the ALJ failed to discuss what specific portions of the treatment record and reported activities of living supported discounting Dr. Spencer's opinion

that Plaintiff's condition would likely deteriorate under stress, he would be distracted from completing tasks, and he would have excessive absences from work. "The lack of explanation and ambiguity in the ALJ's critique hinders meaningful review by this Court." *Carter v. Comm'r of Soc. Sec.*, 137 F. Supp. 3d 998, 1007 (S.D. Ohio 2015); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013) ("The failure to provide 'good reasons' for not giving [the treating doctor's] opinions controlling weight hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation."). Finding that the ALJ did not provide "good reasons" for failing to give Dr. Spencer's opinion controlling weight, this error requires reversal. *See Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician['s] opinion and we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion."); *Wisecup v. Astrue*, No. 3:10CV00325, 2011 WL 3353870, at *8 (S.D. Ohio July 15, 2011) (finding that remand was warranted where the ALJ did not identify the medical evidence that he found inconsistent with the treating physician's opinion).

The Court further concludes that the ALJ's failure to give good reasons for rejecting the opinion of Dr. Spencer does not constitute *de minimis* or harmless error. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). *De minimis* or harmless error occurs: (1) if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of the procedural safeguard of the good reasons rule even though an ALJ has not complied with the express terms of the

regulation. *Id.* None of those factors applies here. Consequently, there is no basis for finding harmless error.

IV.     **CONCLUSION**

Based upon the foregoing, and pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, after a *de novo* determination of the record, this Court concludes that Plaintiff's Objection to the Report and Recommendation of the Magistrate Judge has merit. The Court, therefore, **SUSTAINS** Plaintiff's Objection (ECF No. 20).

As to Plaintiff's first assignment of error (ECF No. 11), the Court **ADOPTS** the Magistrate Judge's R&R (ECF No. 19) and **AFFIRMS** the Commissioner's decision. As to Plaintiff's second assignment of error (ECF No. 11), the Court **REJECTS** the Magistrate Judge's R&R (ECF No. 19) and **REVERSES** the Commissioner's decision. This matter is **REMANDED** to the Commissioner under the Fourth Sentence of 42 U.S.C. § 405(g) for proceedings consistent with this Opinion.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
SARAH D. MORRISON
UNITED STATES DISTRICT JUDGE